**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **DIANNE J. LAMMERT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:04CV1662 ERW (LMB)** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying Dianne J. Lammert's applications for a Period of Disability and Disability Insurance

Benefits under Title II of the Social Security Act. The cause was referred to the undersigned

United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636

(b). Plaintiff has filed a Brief in Support of Complaint (Document Number 9). Defendant has

filed a Brief in Support of the Answer. (Doc. No. 11).

**Procedural History**

On June 25, 2002, plaintiff filed her application for a Period of Disability and Disability

Insurance Benefits, claiming that she became unable to work due to her disabling condition on

October 8, 2001.[1] (Tr. 47-49). This claim was denied initially, and following an administrative

---

[1]Plaintiff previously filed an application for benefits under Title II, which was denied on
March 20, 2002 and was not pursued further. (Tr. 13). The ALJ found that plaintiff implicitly
requested reopening of that decision. (Id.). The ALJ, however, determined that there was no

hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated January 8, 2004. (Tr. 36-39, 13-16). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on October 12, 2004. (Tr. 7, 3-5). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481 (2003).

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on November 12, 2003. (Tr. 214). Plaintiff was present and was represented by counsel. (Id.). The ALJ noted that a vocational expert, Mr. James E. Israel, was present. (Id.). The ALJ stated that an additional document was submitted the morning of the hearing. (Id.). The ALJ next admitted the exhibits into the record. (Tr. 215).

Plaintiff's attorney then examined plaintiff, who testified that she lives with her husband, who assists her with her daily activities. (Id.). Plaintiff stated that her husband helps her walk, does the laundry, takes out the trash, and sweeps the floors. (Tr. 216). Plaintiff explained that she holds onto her husband for support when she does not have her cane. (Id.). Plaintiff testified that her daughter also assists her with her daily activities by cleaning. (Id.). Plaintiff stated that she graduated from high school and attended one year of beauty school. (Id.). Plaintiff testified that she has a beautician's license, although it is not current. (Id.). Plaintiff stated that she stopped working as a beautician five years prior to the hearing. (Id.). Plaintiff stated that she has

_____

good reason to reopen the prior determination and denied plaintiff's request to reopen. (Id.). Accordingly, res judicata applies to the period before March 20, 2002, and the present action deals with plaintiff's condition after that date. Any reference made to evidence dated prior to March 20, 2002 is made solely for historical purposes.

worked at several salons and that she owned her own salon for three years beginning in 1983. (Id.). Plaintiff testified that she worked at home as a beautician after she left the salon, until 10 years prior to the hearing. (Tr. 217).

Plaintiff testified that the last job she had was at PDM doing medical billing. (Id.). Plaintiff stated that she did secondaries, which involved processing paperwork and sending bills to insurance companies. (Id.). Plaintiff testified that this job had a quota or speed requirement that she was unable to meet. (Id.). Plaintiff stated that she worked at United Van Lines before she worked at PDM. (Id.). Plaintiff testified that she worked in the corporate cash department at United Van Lines, which involved doing paperwork. (Tr. 218). Plaintiff stated that there were no quotas or speed requirements at this jobs, although the job required her to be very exact. (Id.). Plaintiff testified that she worked at this job for three years. (Id.). Plaintiff stated that she did not think that she could perform this job now because it requires a lot of sitting. (Id.). Plaintiff testified that she cannot sit too long and that she can hardly stand at all. (Id.). Plaintiff further testified that she requires assistance with walking. (Id.).

Plaintiff stated that the jobs she had prior to her position at United Van Lines all involved medical billing. (Tr. 219). Plaintiff explained that these positions were detail-oriented, although they did not involve quotas or speed requirements. (Id.). Plaintiff testified that she could not think of any jobs that she could perform at the present time. (Id.). Plaintiff explained that she has not pursued any jobs since PDM because they either involve walking or prolonged standing. (Id.).

Plaintiff testified that she is able to drive if she takes her time, although she experiences difficulty driving at night. (Id.). Plaintiff stated that she drives about 70 miles a week, which

equals the drive to and from her mother's house.  (Id.).  Plaintiff explained that she had been visiting her mother every day until a week prior to the hearing because her mother had just undergone open-heart surgery.  (Tr. 220).  Plaintiff testified that she assisted her mother by bringing her food and drinks.  (Id.).

Plaintiff testified that she can sit for 30 to 45 minutes before she has to get up and stand for two minutes.  (Id.).  Plaintiff stated that she could not work at a job where she could sit for 45 minutes to an hour, stand up for a few minutes, and sit back down for eight hours a day.  (Tr. 221-22).  Plaintiff explained that she could not sit constantly for an hour at a time with only a two-minute break because her legs "won't allow it."  (Tr. 222).

Plaintiff testified that she can stand in one place for five minutes before her legs become weak.  (Id.).  Plaintiff stated that she can walk unassisted for short distances by using hand railings or hanging onto walls.  (Id.).  Plaintiff testified that she can walk for a block when using her cane. (Id.).  Plaintiff stated that she is able to walk up and down the steps at her home slowly.  (Id.). Plaintiff testified that she walks up and down the steps at her home 15 to 20 times a day because the bathroom is located on the second floor.  (Tr. 223).

Plaintiff testified that she can lift a gallon of milk, but she cannot carry it except for very short distances, while using both hands.  (Id.).  Plaintiff stated that she is able to bend over to tie her shoes and pick things off the floor if she holds onto something, otherwise she becomes dizzy. (Id.).  Plaintiff testified that she is able to reach above her head if she holds onto something.  (Id.). Plaintiff stated that she does not use her cane around the house but that she uses it 98 percent of the time when she leaves the house.  (Id.).  Plaintiff testified that her doctor did not prescribe the cane but that he is aware that she is using it.  (Id.).  Plaintiff stated that she uses the cane for

stability.  (Id.).

Plaintiff testified that she experiences pain mostly in her knees.  (Tr. 224).  Plaintiff stated that the pain is not constant, but rather she experiences leg spasms when she sits down in the evening to watch television.  (Id.).  Plaintiff testified that she can sit for a half hour before the leg spasms begin.  (Id.).  Plaintiff stated that Advil, Valium,[2] and diazepam[3] provide relief for the pain caused by the leg spasms.  (Id.).  Plaintiff testified that her multiple sclerosis (MS)[4] also causes her to experience "total dizziness," weakness in her legs, and loss of strength in her left hand.  (Id.).  Plaintiff stated that she is dizzy 24 hours a day and that nothing provides relief for the dizziness.  (Id.).  Plaintiff explained that her dizziness is increased when she turns her head too fast and when she watches objects move quickly.  (Tr. 224-25).  Plaintiff testified that the dizziness affects her ability to read.  (Tr. 225).

Plaintiff stated that she also experiences fatigue, primarily in her legs.  (Id.).  Plaintiff testified that she experiences "500 percent fatigue" in the summer, and pain in her bones in the winter.  (Id.).  Plaintiff described "500 percent fatigue" as fatigue experienced in her entire body.  (Id.).  Plaintiff stated that she only experiences this fatigue in the summer heat.  (Tr. 225-26).

---

[2]Valium is indicated for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety.  Valium is a useful adjunct for the relief of skeletal muscle spasm.  See Physician's Desk Reference (PDR), 2957 (59th Ed. 2005).

[3]Valium is a brand of diazepam.  See PDR at 2957.

[4]"Multiple sclerosis is a common demyelinating disorder of the central nervous system, causing patches of sclerosis in the brain and spinal cord; occurs primarily in young adults, and has protean clinical manifestations, depending upon the location and size of the plaque; typical symptoms include visual loss, diplopia nystagmus, dysarthria, weakness, paresthesias, bladder abnormalities, and mood alterations; characteristically, the plaques are 'separated in time and space' and clinically the symptoms show exacerbations and remissions.  See Stedman's Medical Dictionary, 1605 (27th Ed. 2000).

Plaintiff explained that the only time she does not experience fatigue in the summer is when she stays indoors in air-conditioned spaces. (Tr. 226). Plaintiff testified that her bones "tighten up" when it is cold. (Id.).

Plaintiff testified that she takes medications as prescribed to her. (Id.). Plaintiff stated that she experienced side effects, including "total fatigue," for the first few years after she began taking her medication. (Id.). Plaintiff explained that she began receiving weekly injections of Avonex[5] in January of 1999. (Tr. 227). Plaintiff stated that she experienced fatigue for the first three years that she received the Avonex injections but that she no longer experiences side effects from the injections. (Id.). Plaintiff testified that the first few years she would sleep all day the day after she received the injection. (Id.). Plaintiff stated that she now sleeps all night if she does not have leg pain. (Id.). Plaintiff testified that she sleeps six to seven hours a night. (Id.). Plaintiff stated that her energy level is about 50 percent. (Id.).

Plaintiff testified that she is able to cook but she can only cook for five to ten minutes before she has to sit down. (Tr. 228). Plaintiff stated that she is able to prepare a complete meal but it takes her a long time to do so. (Id.). Plaintiff explained that she mostly goes out to eat. (Id.). Plaintiff testified that she does not go to the grocery store and that her husband does the grocery shopping. (Id.). Plaintiff explained that the only way she is able to accompany her husband to the grocery store is by riding in a motorized cart. (Id.). Plaintiff testified that the only housework she does is dusting. (Id.). Plaintiff stated that she can do laundry by hanging on to

---

[5]Avonex is indicated for the treatment of patients with relapsing forms of multiple sclerosis to slow the accumulation of physical disability and decrease the frequency of clinical exacerbations. Patients with multiple sclerosis in whom efficacy has been demonstrated include patients who have experienced a first clinical episode and have MRI features consistent with multiple sclerosis. See Stedman's at 952.

something for support so she does not become dizzy.  (Id.).  Plaintiff testified that she is able to

bathe, shower, and take care of her personal needs because she has a stool in the bathtub.  (Id.).

Plaintiff stated that she spends her days visiting her mother and working on the computer.

(Tr. 229).  Plaintiff testified that she can work on the computer for about a half hour before she

has to stand up and walk to the bathroom.  (Id.).  Plaintiff stated that she experiences difficulty

with concentration and memory.  (Id.).  Plaintiff testified that she has to write everything down or

she will forget.  (Id.).  Plaintiff stated that she has been experiencing problems with her memory

for about five years.  (Id.).  Plaintiff testified that she does not believe she can focus and

concentrate well enough to perform full-time work.  (Id.).  Plaintiff stated that she could probably

only focus on work activities for about an hour.  (Id.).

Plaintiff testified that she does not use any street drugs and that consumes alcohol very

rarely.  (Tr. 229-30).  Plaintiff stated that she smokes a pack of cigarettes a day.  (Tr. 230).

Plaintiff testified that her doctor has recommended that she quit smoking and that she quit for a

year.  (Id.).  Plaintiff stated that she reduced her smoking from two packs of cigarettes a day to

one pack a day.  (Id.).

The ALJ then examined plaintiff, who testified that she smoked two packs of cigarettes a

day for 20 to 25 years, until three years prior to the hearing.  (Tr. 230-31).  Plaintiff explained that

she quit smoking for a year in 2002.  (Tr. 231).  Plaintiff stated that she has been using a cane for

walking for two to three years.  (Id.).

The ALJ then indicated that plaintiff's testimony that she experiences "total dizziness"

appears inconsistent with her testimony that she drives on a daily basis.  (Id.).  Plaintiff explained

that she is able to drive by staying in the slow lane and driving slowly, straight ahead, on the same

roads. (Id.). The ALJ noted that plaintiff cannot drive to any destination without making turns. (Id.). Plaintiff testified that when she makes a jerk movement while driving she experiences dizziness for an instant. (Tr. 232). Plaintiff indicated that this dizziness she experiences is not severe enough to prevent her from proceeding to her destination. (Id.). Plaintiff testified that she was involved in a traffic accident a year prior to the hearing when she was rear-ended, and that this is the only accident she has ever had. (Id.).

Plaintiff testified that she is able to carry a gallon of milk about five feet if she uses both hands. (Tr. 232-33). Plaintiff stated that she is able to pour milk from a gallon container if she sits down and leans the container on the sink. (Tr. 233). Plaintiff testified that she spends about three hours a day watching television. (Id.). Plaintiff stated that she stopped managing a softball team in March of 2002 because she could not attend all of the games due to the heat and because the responsibility of scheduling games became "too much" for her. (Tr. 233-34).

Plaintiff testified that she worked managing a cafeteria in 1992. (Tr. 234). Plaintiff stated that she ordered items and filled vending machines at this position. (Id.). Plaintiff testified that she worked at this position for three years. (Id.). Plaintiff stated that she worked in the sample department of a candy factory prior to working as the cafeteria manager. (Tr. 235). The candy factory was located in the same place as the cafeteria. (Id.). Plaintiff explained that at this position she sat on a stool and packed small boxes with samples of candy. (Id.). Plaintiff testified that she lifted over 25 pounds at this position. (Id.).

Plaintiff stated that she also worked at a credit union as a loan processor. (Tr. 235-36). Plaintiff stated that she worked at two different credit unions for two years each. (Tr. 236). Plaintiff testified that she left the last job at the credit union because the drive was too long. (Id.).

Plaintiff stated that after the credit union job, she worked at a t-shirt factory doing accounting work.  (Id.).  Plaintiff testified that she was terminated from this job because she had no accounting training and she could not perform the job.  (Id.).  Plaintiff stated that she worked at United Van Lines next.  (Tr. 237).  Plaintiff explained that she left this job to go to PDM because that position paid more.  (Id.).  Plaintiff testified that she worked at PDM for 90 days, until she was terminated for not working fast enough.  (Id.).

Plaintiff stated that the pain she experiences in her knees in the evening is brought on by sitting and by walking around her house all day.  (Id.).  Plaintiff testified that she does not experience pain in any other part of her body.  (Id.).  Plaintiff stated that the dizziness she experiences is the only problem that prevents her from working.  (Id.).  Plaintiff testified that she has been experiencing dizziness at the level she described at the hearing since 1997.  (Tr. 238).  Plaintiff clarified for the ALJ that her dizziness has remained at the same level since 1997.  (Id.).

Plaintiff's attorney then examined plaintiff, who testified that the fatigue in her legs has increased since 1997.  (Id.).  Plaintiff stated that her legs also become restless sooner now than they did in 1997.  (Id.).

The ALJ next examined the vocational expert, James E. Israel, who testified that he had not had any contact with plaintiff prior to the hearing and that he had reviewed the file.  (Tr. 239).  Mr. Israel described plaintiff's original career as a cosmetologist as skilled, light work, which evolved into a number of different types of jobs.  (Id.).  Mr. Israel testified that plaintiff's jobs at the credit unions involved general clerical office skills such as copying, processing loans, making sure applications were completed, and opening accounts, which would be transferable skills. (Id.).  Mr. Israel stated that there was also a degree of customer service involved, which he

described as semi-skilled and transferable. (Tr. 240). Mr. Israel testified that most of plaintiff's jobs were performed at a level between sedentary and light. (Id.). He noted that plaintiff did a lot of filing and was on her feet a lot. (Id.). Mr. Israel stated that plaintiff had a factory job that was of too short a duration and that there were no transferable skills associated with plaintiff's semi-skilled job as a food service manager. (Id.). Mr. Israel summarized that plaintiff had modest skills in general clerical work based on her work profile. (Id.).

After the ALJ requested clarification, Mr. Israel testified that plaintiff's job as a food service manager was skilled and medium in exertion. (Id.). Mr. Israel stated that he would add food service management to plaintiff's base of transferable skills in the food service industry. (Tr. 240-41).

The ALJ then asked Mr. Israel to assume a hypothetical worker who was able to perform at the sedentary level, lifting and carrying ten pounds occasionally, sitting for a total of six hours in an eight-hour day with breaks, standing and walking for up to two hours in an eight-hour day with breaks, and who should avoid exposure to extreme temperatures. (Tr. 241). Mr. Israel testified that such an individual could perform plaintiff's past work of loan processing, credit applications, and customer service. (Id.). Mr. Israel stated that such as individual could also perform sedentary general clerical processing jobs. (Id.).

The ALJ next asked Mr. Israel to assume the same factors from the first hypothetical except that the worker would require a break or at least a change of position from sitting to standing at no more than one-hour intervals. (Tr. 241-42). Mr. Israel responded that this restriction would have only a marginal effect and that a large number of sedentary jobs would still exist. (Tr. 242). Mr. Israel noted that workers routinely stretch throughout the day. (Id.).

The ALJ then asked Mr. Israel to assume the same factors from the second hypothetical, but adding that the worker would be limited to work that would only occasionally deal with understanding, remembering, and following detailed instructions.  (Id.).  Mr. Israel stated that these restrictions would preclude the loan processing position and many other clerical jobs.  (Id.). The ALJ asked the vocational expert whether an individual of the same age, education, and work experience as plaintiff would be able to adjust to other work, considering the factors set out in the third hypothetical.  (Id.).  Mr. Israel testified that such an individual could perform sedentary assembly jobs, such as sorting, and other jobs that do not require detailed instructions.  (Id.).  Mr. Israel stated that approximately 4200 of such sedentary factory assembly jobs exist in the State of Missouri.  (Id.).

The ALJ next asked Mr. Israel to assume the same factors from the third hypothetical, but adding the factor that the worker could not undertake work that was based upon a specific production quota.  (Tr. 243).  Mr. Israel testified that this factor would eliminate all jobs.  (Id.). The ALJ then asked Mr. Israel whether such an individual could perform plaintiff's past work assembling sample boxes in the candy factory.  (Id.).  Mr. Israel characterized that job as light, because it required the worker to be on his or her feet.  (Id.).  He stated that this work would thus be precluded even by the earlier hypotheticals.  (Tr. 244).  The ALJ then closed the record and concluded the hearing.  (Id.).

**B.**     **Relevant Medical Records**

The record reveals that plaintiff was seen by Gary H. Myers, M.D. for a neurological consultation on November 24, 1998.  (Tr. 143).  Plaintiff complained of an unsteady gait that had been occurring for a few months.  (Id.).  Plaintiff also complained of muscle jerking in her legs

when she sits for over two hours, which had been occurring for a few years and remained unchanged. (Id.). Upon physical examination, Dr. Myers found that plaintiff was unsteady and that she tended to lean to the left when she pivots, but she does not fall. (Tr. 144). Dr. Myers stated that plaintiff leaned to the left and actually held onto the wall. (Id.). Dr. Myers' impression was possible multiple sclerosis and cerebellar ataxia.[6] (Tr. 145). An MRI[7] scan of plaintiff's brain taken in November of 1998, along with laboratory results, suggested the presence of MS. (Tr. 147, 152).

Plaintiff saw Dr. Myers for a neurological re-evaluation on March 14, 2000. (Tr. 141). Dr. Myers noted that plaintiff was "doing well." (Id.). Dr. Myers stated that plaintiff's multiple sclerosis was still present and that she takes Avonex weekly. (Id.). Plaintiff reported dizziness from the multiple sclerosis. (Id.). Dr. Myers found that plaintiff was "a little unsteady with walking," but that she was able to keep her balance. (Id.). Dr. Myers stated that plaintiff was "really doing fairly well and she is stable." (Id.).

Plaintiff presented to James Edward F. Alonso, M.D., on July 10, 2000, for the evaluation and treatment of her multiple sclerosis. (Tr. 159). Plaintiff reported dizziness and loss of balance, especially when she gets up and when she turns her head. (Id.). Plaintiff indicated that she sometimes falls over because these symptoms are so pronounced. (Id.). Plaintiff also reported difficulty standing and walking for long periods of time. (Id.). In addition, plaintiff reported fatigue, which especially occurs when she is hot. (Id.). Dr. Alonso found plaintiff to be alert and

---

[6]Loss of muscle coordination caused by disorders of the cerebellum, which is the large posterior brain mass consisting of two lateral hemispheres united by a narrow middle portion, the vermis. See Stedman's at 161, 323.

[7]Abbreviation for Magnetic Resonance Imaging. Stedman's at 1135.

oriented, with good naming and good repeats.  (Id.).  Dr. Alonso stated that plaintiff had an

unsteady gait and experienced difficulty with heel, toe, and tandem walk.  (Tr. 160).  Dr. Alonso's

impression was multiple sclerosis.  (Id.).  He noted that plaintiff appeared to be "clinically stable"

on Avonex.  (Id.).  Dr. Alonso recommended that plaintiff continue Avonex, continue weaning

herself off of Valium, and consider taking Amantadine[8] for fatigue.  (Id.).

On October 9, 2000, plaintiff saw Dr. Alonso for a routine follow-up.  (Tr. 158).  Dr.

Alonso noted that plaintiff was doing "very well," and that she had "no complaints."  (Id.).  Dr.

Alonso stated that plaintiff remained "very functional," and continued to "do well at home and at

work."  (Id.).  Plaintiff did report occasional muscle cramps or spasms.  (Id.).  Upon physical

examination, Dr. Alonso found plaintiff's gait to be steady with good toe walking and a decrease

in heel walking.  (Id.).  Dr. Alonso's impression was "multiple sclerosis-clinically, doing very

well."  (Id.).  He recommended that plaintiff continue the Avonex, consider Amantadine for

fatigue if necessary, continue current high level of activity, and return to the office for yearly

check-ups.  (Id.).

On February 5, 2001, plaintiff presented to Dr. Alonso for a routine follow-up.  (Tr. 157).

Plaintiff reported a period of excessive fatigue a few weeks prior to her check-up.  (Id.).  Plaintiff

reported that she began to feel much better in the week prior to her appointment.  (Id.).  Upon

physical examination, Dr. Alonso found plaintiff's gait to be steady with good toe walking, and

decreased heel walking.  (Id.).  Dr. Alonso's impression was "multiple sclerosis-again, clinically

doing very well.  Suspect an increase in fatigue from her multiple sclerosis, however, she is

---

[8]Amantadine is indicated for the prophylaxis and treatment of signs and symptoms of
infection caused by various strains of influenza A virus.  It is also indicated for the treatment of
parkinsonism.  See PDR at 1224.

currently back to baseline." (Id.). Dr. Alonso again recommended continuing the Avonex, considering Amantadine if her fatigue becomes chronic, and returning to the office for yearly check-ups. (Id.).

On October 2, 2001, plaintiff presented to Dr. Alonso for a routine follow-up. (Tr. 156). Plaintiff reported feeling fatigued. (Id.). Dr. Alonso noted that plaintiff was active, and worked outside the home. (Id.). Dr. Alonso stated that plaintiff indicated that although she was tired, she did not wish to take any additional medication. (Id.). Plaintiff reported that she can function and conduct her activities of daily living. (Id.). Upon physical examination, Dr. Alonso found plaintiff's gait to be steady. (Id.). He indicated that plaintiff had difficulty with heel, toe, and tandem walking. (Id.). Dr. Alonso's impression was "multiple sclerosis-clinically doing very well." (Id.). Dr. Alonso recommended that plaintiff continue Avonex, undergo an MRI, and return for yearly check-ups. (Id.).

On March 19, 2002, a non-examining state agency medical consultant completed a physical residual functional capacity assessment. (Tr. 62-69). The consultant expressed the opinion that plaintiff could occasionally lift 10 pounds, frequently lift 10 pounds, stand or walk for at least 2 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and was unlimited in her ability to push or pull. (Tr. 63). In addition, the consultant found that plaintiff could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, and could never climb ladders, ropes, or scaffolds. (Tr. 64). The consultant further found that plaintiff had no manipulative, visual, communicative, or environmental limitations. (Tr. 65-66). The consultant's assessment was based primarily on the medical records of Dr. Alonso. (Tr. 67-69).

Plaintiff presented to Ghazala Hayat, M.D. for a neurological evaluation on April 29,

2002. (Tr. 174). Dr. Hayat stated that plaintiff has been taken Avonex since being diagnosed with MS in 1998, and has "gotten progressively worse," although there was no evidence of relapses. (<u>Id.</u>). A physical examination revealed plaintiff's gait was wide based and that plaintiff took small steps. (<u>Id.</u>). Plaintiff was found to have a normal attention span, and concentration level. (Tr. 182). Dr. Hayat stated that plaintiff has "relapsing remitting multiple sclerosis." (Tr. 175). Dr. Hayat recommended another MRI scan of the brain. (<u>Id.</u>). Dr. Hayat continued the Avonex and started plaintiff on Cylert[9] for fatigue. (<u>Id.</u>).

On July 19, 2002, in response to a request for plaintiff's medical records, the office of Philip Latham Martin, M.D. stated that plaintiff was not disabled in Dr. Martin's opinion. (Tr.149).

Another state agency non-examining medical consultant, Jerry L. Kinder, M.D., completed a physical residual functional capacity assessment on September 6, 2002. (Tr. 80-87). Dr. Kinder expressed the opinion that plaintiff could occasionally lift 10 pounds, frequently lift less than 10 pounds, stand or walk for at least 2 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and that her ability to push or pull was unlimited. (Tr. 81). Dr. Kinder found that plaintiff could occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl, and that she could never climb ladders, ropes, or scaffolds, or balance. (Tr. 82). Dr. Kinder further found that plaintiff had no manipulative, visual, or communicative limitations. (Tr. 83-84). Dr. Kinder stated that plaintiff should avoid all exposure to hazards, such as machinery and heights. (Tr. 84). Dr. Kinder noted that plaintiff's allegations were only partially credible, based on her reported

---

[9]Cylert is a central nervous system stimulant indicated in Attention Deficit Hyperactivity Disorder. <u>See</u> <u>PDR</u> at 418-19.

activities of daily living and the medical record. (Tr. 83). Dr. Kinder expressed the opinion that plaintiff was capable of performing at least sedentary work. (Tr. 82).

Plaintiff underwent another MRI scan of the brain on May 16, 2002, which revealed findings suggestive of MS. (Tr. 186).

Dr. Hayat's treatment notes dated August 6, 2002, indicate that plaintiff was off work and was applying for disability benefits. (Tr. 176). Dr. Hayat found that there had been "no clear progression since last year," and that plaintiff had no new complaints. (Id.). Dr. Hayat noted that plaintiff did not try the Cylert for fatigue due to the potential side effects. (Id.).

On January 9, 2003, plaintiff presented to Dr. Myers for a neurological re-evaluation. (Tr. 188). Plaintiff reported that her MS symptoms were "essentially stable," and that she was still experiencing dizziness. (Id.). Plaintiff's main complaint was muscle jerking. (Id.). Plaintiff indicated that if she sits for a prolonged period of time and then stands up, she experiences muscle cramping. (Id.). Laboratory testing of plaintiff's spinal fluid was positive for MS. (Id.). Upon physical examination, Dr. Myers found that plaintiff's coordination was normal. (Id.). Dr. Myers noted that plaintiff became unsteady and tended to fall when standing with her eyes closed. (Tr. 189). No muscle jerking was noted at the time. (Id.). Dr. Myers recommended that plaintiff continue her medications, including Prevacid,[10] Accupril,[11] Avonex, and OsCal.[12] (Id.). He also recommended Valium as needed, to help with the muscle cramping. (Id.).

Plaintiff saw Dr. Myers on April 7, 2003 for a neurological re-evaluation. (Tr. 190). Dr.

---

[10]Prevacid is indicated for the relief of heartburn. See PDR at 3205.

[11]Accupril is indicated for the treatment of hypertension. See PDR at 2579.

[12]Calcium supplement tablets. See PDR at 2211.

Myers found that plaintiff was "essentially stable." (Id.). Plaintiff complained of increased muscle spasms and restless leg problems, which are worse in the evening when she is resting. (Id.). Dr. Myers noted that plaintiff was pursuing disability benefits and that she was laid off because she did not work fast enough. (Id.). Upon physical examination, Dr. Myers found plaintiff's reflexes to be brisk and her coordination to be normal. (Id.). Dr. Myers recommended that plaintiff take Sinemet[13] to help the restless leg problem, and continue the Avonex. (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant is insured for a Period of Disability and Disability Insurance Benefits throughout the period of this decision.

2.    The claimant has not engaged in substantial gainful activity since March 21, 2002, the day after the date her prior Title II application was denied. 20 C.F.R. § 404.1520(b).

3.    The claimant has been more than minimally limited by multiple sclerosis. 20 C.F.R. § 404.1520(c).

4.    The claimant's condition has not met or medically equaled a listing in 20 C.F.R. pt. 404, subpt. P, app. 1. 20 C.F.R. § 404.1520(d).

5.    The claimant's allegation of disability is not credible. Polaski v. Heckler, 751 F.2d 943, 948 (8th Cir. 1984); 20 C.F.R. § 404.1529.

6.    Since March 21, 2002, the claimant has had the residual functional capacity to: lift or carry ten pounds occasionally; sit six hours in an eight-hour day with brief breaks to stand and stretch after each hour; and stand or walk a total of two hours in an eight-hour day with usual breaks. She has had to avoid exposure to extreme heat and cold. 20 C.F.R. § 404.1567.

[13]Sinemet is a combination of carbidopa and levodopa indicated for the relief of muscle stiffness and weakness associated with Parkinson's disease. See PDR at 3083.

7.  The claimant has been able to perform her past relevant work as a loan processor or customer service clerk since March 21, 2002. 20 C.F.R. § 404.1520(e). This finding is supported by vocational expert testimony.

8.  The claimant has not been disabled as defined in the Social Security Act since March 21, 2002, and thus is not entitled to a Period of Disability and Disability Insurance Benefits.

(Tr. 16).

The ALJ's final decision reads as follows:

The claimant's application for a Period of Disability and Disability Insurance Benefits, filed on June 25, 2002, is denied in that the claimant has not been disabled in accordance with the Social Security. Thus, she is not entitled to a Period of Disability and Disability Insurance Benefits. There is no basis to reopen the claimant's adverse March 20, 2002 Title II determination.

(Id.).


## Discussion

### A.  Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). It is not the court's task "to review the evidence and make an independent decision." See Mapes, 82 F.3d at 262. If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See id. The reviewing court,

however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.**     **The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.
See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.
 See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age,

education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure

must be followed at each level of administrative review.  See id.  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000).  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of

medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Pratt, 956 F.2d at 834-35; Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

## C.    Plaintiff's Claims

Plaintiff raises two claims on appeal of the decision of the Commissioner. Plaintiff argues that the ALJ erred in discrediting plaintiff's subjective complaints of pain and limitations. Plaintiff also argues that the ALJ erred in evaluating the medical evidence.

## 1.    Credibility Analysis

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible. Defendant contends that the ALJ's credibility determination is supported by substantial evidence on the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski, 739 F.2d at 1322 (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133

F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working are credible.

In his opinion, the ALJ specifically cited the relevant Polaski factors. (Tr. 14). The ALJ then properly pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. The ALJ first stated that the medical evidence does not support plaintiff's subjective complaints. Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). The ALJ first noted that plaintiff was diagnosed with MS in November 1998, three years prior to the alleged onset date, yet an MRI scan of plaintiff's brain taken in May 2002 does not show any significant change from an MRI taken in November 1998. Plaintiff objects to the ALJ's interpretation of the MRI scans. While it is true that it is questionable whether there were any

changes from the first MRI to the later one, other objective medical evidence in the record supports the ALJ's credibility determination.

The ALJ next states that an April 2002 report of Dr. Hayat reveals that plaintiff had normal strength, muscle tone, cerebellar coordination ability, attention span, ability to concentrate, ability to comprehend and articulate, good recent and remote memory, and an ability to think in the abstract. (Tr. 174, 182-83). The ALJ also noted that an August 2002 report from Dr. Hayat shows that plaintiff had no clear progression of symptoms in the preceding six months, plaintiff's gait was normal, and plaintiff could heel walk and toe walk. (Tr. 176).

The ALJ next points to the June 2002 note from the office of plaintiff's treating physician, Dr. Martin, indicating that Dr. Martin did not consider plaintiff disabled. (Tr. 149). The ALJ also stated that Dr. Kinder, the state agency physician who reviewed plaintiff's medical records, did not consider plaintiff disabled.

The ALJ next discussed the records of Dr. Myers, plaintiff's treating neurologist. On January 9, 2003, Dr. Myers found that plaintiff's symptoms were stable and that plaintiff's coordination was normal. (Tr. 188). Further, on April 7, 2003, the last visit contained in the record, Dr. Myers again noted that plaintiff's condition was stable and that plaintiff's coordination was normal. (Tr. 190). Although plaintiff complained of muscle spasms and restless leg problems, she reported that these symptoms were only severe in the evening, while resting. (Id.).

Finally, the ALJ pointed out that plaintiff last sought treatment for her MS in April 2003. (Tr. 15). Plaintiff's administrative hearing was held in November of 2003. This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997). The ALJ

properly concluded that, based on the objective medical record as a whole, plaintiff's allegation of disability is not credible.

The ALJ next discussed plaintiff's daily activities. The ALJ first noted that plaintiff reported to a treating physician on October 2, 2001, the month of her alleged onset date, that she was active and was able to perform her activities of daily living and otherwise function. (Tr. 156). The ALJ also recounted plaintiff's testimony that she typically drives seventy miles a week, walks up and down the stairs at her home fifteen to twenty time a day, and eats out regularly. (Tr. 15, 219, 222-23, 228). The ALJ noted that plaintiff's ability to drive seventy miles a week is inconsistent with her claim that she experiences dizziness 24 hours a day. (Tr. 15). Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001). As such, the ALJ properly determined that plaintiff's ability to engage in all of these activities on a regular basis appears inconsistent with the inability to work.

The ALJ also discussed the fact that plaintiff was able to work four years after being diagnosed with MS. (Tr. 15). The ALJ found it significant that plaintiff was able to work this length of time despite complaints of constant dizziness. The fact that a claimant worked successfully for a significant period of time with his or her impairments is inconsistent with a claim of disabling pain. See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992).

The ALJ finally discussed aggravating factors. He noted that, although plaintiff claims that excessive heat and cold exacerbate her condition, many jobs do not require exposure to extreme heat or cold. (Tr. 15). The ALJ stated that no assistive devices were prescribed or recommended to plaintiff, despite the fact that plaintiff asserted that she requires a cane to ambulate outside her home 98 percent of the time. (Id.).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not credible is supported by substantial evidence. Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed.

**2.      Medical Evidence**

Plaintiff also objects to the ALJ's evaluation of the medical evidence. Defendant contends that the ALJ properly evaluated the medical opinion evidence.

"A treating physician's opinion is generally entitled to substantial weight; however, such an opinion is not conclusive in determining disability status, and the opinion must be supported by medically acceptable clinical or diagnostic data." Davis v. Shalala, 31 F.3d 753, 756 (8th Cir. 1994). Further, such opinions may also be discounted when a treating physician renders inconsistent opinions. See Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). An ALJ is also free to reject the conclusions of any medical source if those findings are inconsistent with the record as a whole. See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001). "The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (quoting Kelley, 133 F.3d at 589).

Plaintiff first claims that the ALJ erred in failing to mention statements made by Dr. Hayat.

Specifically, plaintiff objects to the ALJ's failure to mention that Dr. Hayat stated on April 29, 2002 that plaintiff had "progressively gotten worse." (Tr. 174). As defendant points out, however, Dr. Hyat made these findings after seeing plaintiff only one time, and appeared to base this finding on plaintiff's self-reported history. Plaintiff points out other findings made by Dr. Hyat on that day that the ALJ did not discuss, such as the fact that pinprick examination revealed inconsistent responses, plantars were down going, her gait was side based, plaintiff took small steps, and plaintiff has relapsing remitting multiple sclerosis. Plaintiff also argues that the ALJ should have discussed Dr. Hayat's August 2002 note that fatigue "continues to be a problem" for plaintiff. (Tr. 176). Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted. See Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). The ALJ's opinion reveals that he considered all of the medical evidence in the record as a whole. As such, the ALJ did not err in failing to mention every piece of evidence.

Plaintiff next argues that the ALJ improperly relied on an unsigned note from Dr. Martin's office in determining that plaintiff was not disabled. Plaintiff suggests that the ALJ should have sought clarification from Dr. Martin or otherwise developed the record. While an ALJ has the duty to develop the record independent of the claimant's burden, the burden of persuasion to prove disability remains on the claimant. See Eichelberger v. Barnhart, 390 F.3d 584, 592 (8th Cir. 2004). Here, no crucial issue was left undeveloped. There was ample medical evidence in the record for the ALJ to review in making his determination. The ALJ did not rely solely on the note from Dr. Martin's office in making his credibility determination. Thus, the ALJ did not err in failing to seek clarification of Dr. Martin's opinion.

Plaintiff also contends that the ALJ erred in relying on the opinion of the state agency

reviewing physician, Dr. Jerry Kinder, because he did not examine plaintiff. It is true that the opinion of a consulting physician who does not examine the claimant does not generally constitute substantial evidence. See Singh, 222 F.3d at 452; Kelley, 133 F.3d at 589. The ALJ, however, did not rely solely on the opinion of Dr. Kinder. As previously discussed, the ALJ's determination is based upon the record as a whole, including medical evidence from plaintiff's treating physicians and plaintiff's own testimony.

Finally, plaintiff claims that the ALJ improperly relied on the January 2003 evaluation by Dr. Myers to support his determination that plaintiff is not disabled. Specifically, plaintiff contends that Dr. Myers' evaluation reveals findings that were positive for MS. The ALJ, however, did not dispute that plaintiff suffers from MS. The question is not whether plaintiff suffers from a particular impairment but, rather, it is whether plaintiff is fully credible when she claims that her impairment prevents her from engaging in substantial gainful activity. See Benksin, 830 F.2d at 883. Although Dr. Myers' evaluation reveals that plaintiff indeed suffers from MS, it also reveals that plaintiff's symptoms were "essentially stable." (Tr. 188). As such, the ALJ did not err in evaluating the records of Dr. Myers.

In summary, the ALJ properly evaluated the medical evidence contained in the record. The objective medical evidence establishes that plaintiff suffers from MS. The evidence is not, however, supportive of plaintiff's allegations of disability due to this impairment. Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed.

## <u>RECOMMENDATION</u>

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's applications for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act be **affirmed**.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  <u>See</u> <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

Dated this \_\_\_20th\_\_\_ day of January, 2006.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE